# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:01 CR 13** |
| | ) | |
| **THOMAS J. ROSBY,** | ) | |
| **JOHN M. FRANKLIN,** *et al.*, | ) | |

### OPINION and ORDER

This matter is before the court on defendant John Franklin's "Motion for New Trial and Supplement to Motion for New Trial and Motion for Acquittal" (DE # 192, docketed as "Second Motion for New Trial," which the court will use as a short reference in this order), and Franklin's "Additional Motion for New Trial and Supplement to Motion for New Trial and Motion for Acquittal" (DE # 193, entered on the docket as "Third Motion for New Trial *requested and demanded* by John M. Franklin, with "Third Motion for New Trial" used herein as a short reference). Franklin's first motion seeking a judgment of acquittal and a new trial, which was filed jointly with defendant Thomas Rosby, was denied in a written order entered November 24, 2004.

The latter of these two motions, the Third Motion for a New Trial, need be addressed only briefly. As relevant here, a motion for a judgment of acquittal must be filed within seven days after a verdict of guilt. FED. R. CRIM. P. 29(c)(1). The same time period applies to a motion for a new trial, unless the motion is based on newly-discovered evidence. FED. R. CRIM. P. 33(b)(1),(2). "Supplemental" motions which attempt to make additional arguments not based on newly discovered evidence violate

these time limits and the court is without jurisdiction to consider them. *United States v. Holt*, 170 F.3d 698, 702-03 (7th Cir. 1999). Franklin's Second and Third Motions for a New Trial were filed nearly 2-1/2 years after the jury returned its guilty verdicts.

At Franklin's sentencing, the court inquired why the Third Motion for New Trial had been filed separately from, and on the same day as, the Second Motion for New Trial, and docketed with the unusual entry "*requested and demanded* by John M. Franklin." Franklin's counsel candidly admitted that he believed that the motion was not based on newly-discovered evidence and therefore without merit, and that he had filed it only because his client absolutely demanded that he do so. While that does not bode well, the court has not accepted counsel's statement without question, instead reviewing the motion and forming its own conclusion. It is clear to the court that the motion is not based upon any newly-discovered evidence, but instead rehashes and varies the arguments made in Franklin's first motion for a new trial, which arguments were already rejected by the court on November 24, 2004. Under these circumstances, the court is without jurisdiction to consider the motion. *Holt*, 170 F.3d at 702-03.

On the other hand, with the exception of a variance argument[1] discussed briefly at the conclusion of this opinion, Franklin's Second Motion for a New Trial is based entirely on two documents which he contends are newly-discovered evidence, which in turn lead to the discovery of (allegedly) perjured testimony at trial, all of which is

---

[1] Franklin does attempt to base his variance argument on newly-discovered evidence. As will be explained, however, the court rejects this attempt.

2

material to the issue of his guilt or innocence. First, a document entitled "Third Amendment to Stock Purchase Agreement" (hereinafter, "SPA Amendment") which Franklin obtained after the criminal trial as part of discovery produced in a related civil case.[2] Simplifying the corporate relationships involved to explain the essence of the transaction, the SPA Amendment applied to a stock purchase agreement in which the Newcourt Credit Group USA, Inc. ("Newcourt") was to acquire ownership of Anthem Premium Finance ("APF"), resulting in it no longer being a subsidiary within the Anthem, Inc. group of companies.

APF was a victim of the fraud scheme that Franklin stands convicted of executing, which involved inducing APF to lend funds to the Monon Corporation ("Monon") based on false representations. The SPA Amendment required APF's parent corporation to purchase from APF for cash all Monon receivables at book value. In other words, Newcourt, instead of acquiring a company with a potentially-worthless receivable of approximately $6,000,000, would acquire a company with a cash asset in that amount. The potentially-worthless receivable would remain in the Anthem, Inc. group.

---

[2] The court notes that while Franklin may imply that the government had this document prior to his criminal trial, he does not specifically argue that the government failed to produce the document in violation of the rule announced in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In any event, the government maintains that it did not know that the document existed until it saw the copy attached to Franklin's Second Motion for a New Trial.

The second document is a "Victim Impact Statement" which was in the government's files fifteen months before the trial in this case, which also was produced to Franklin as discovery in the related civil case. In that document, one of Anthem, Inc.'s corporate attorneys answers "no" to the question whether Anthem incurred any losses or expenses as a result of the crime. In a memorandum order entered December 21, 2005, denying co-defendant Rosby's motion for a new trial, the court describes this document at length and explains why the government's failure to provide it prior to trial did not violate *Brady*. Independent of his other arguments discussed herein, Franklin also claims that the government's failure to disclose the document violated *Brady*. For the reasons explained in the December 21, 2005, memorandum order—which the court now incorporates here by reference—the court disagrees with this assertion and finds that no *Brady* violation occurred.

To understand Franklin's theory as to why these newly-discovered documents would have had a material impact on the issue of his guilt or innocence and would probably lead to an acquittal in the event of a retrial,[3] a third piece of the puzzle must be explained, the allegedly perjured testimony at trial of Jack Swanton, the President and CEO of APF. More or less as Franklin argues, Swanton had stated prior to trial in various interviews with the FBI and testified on direct at trial that APF could legally only lend money to Monon to finance Monon's insurance premiums, that Swanton

---

[3] These two elements are the *sine qua non* of a motion based on new evidence that could not have been discovered in the exercise of due diligence. *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005); *United States v. Kamel*, 965 F.3d 484, 490 (7th Cir. 1992).

4

thought he was approving loans for that purpose only, and that the only reason APF lent nearly five million dollars to Monon in excess of Monon's insurance premium needs was because of the fraud perpetrated by Franklin and his co-conspirators. Franklin argues that an unfair surprise at trial showed that this was perjury: Swanton contradicted himself by testifying during cross-exam that APF was willing to lend money to Monon on an "as needed" basis. In other words, the loans were not solely for insurance premiums and did not result from fraud. Franklin argues that had the two documents described immediately above been in his possession, there would have been no unfair surprise because he would have understood the real reason for APF lending money to Monon "as needed" and could have shown that reason to the jury.

The real reason for the loans, Franklin asserts, was that Swanton was trying to inflate APF's receivables in order to "gussy-up" APF for sale to bring a higher price from the buyer. Second Motion for New Trial at 10.

> The jury's decision probably would have been influenced to acquit, if the Defense had been able to present key facts learned from the two key documents, as they relate to Anthem lending money on an "as needed" basis and particularly lending $7.6 million for insurance policies totaling $2.7 million.

Second Motion for New Trial at 6-7. Franklin believes that the victim impact statement confirms his theory by showing that APF believes that it suffered no loss because "the Monon receivable was purchased at full value on the books of Anthem on

December 23, 1996, post bankruptcy." Second Motion for New Trial at 2-3 (citation to exhibit omitted).[4]

While Franklin's argument is creative and deserves an "A" for effort, the court believes that its entire premise is wrong, as are the various conclusions/assertions Franklin draws from that premise. First, as to the premise itself, the court does not agree that Swanton contradicted himself at trial by admitting that APF made loans to Monon on an "as needed" basis for purposes other than insurance premium finance.

Franklin's assertion that Swanton so testified is based on Swanton's answer to one question put to him during cross-examination, or, more accurately stated, is based on an extrapolation from the phrasing of the question put to Swanton and Swanton's answer being cut short:

> Q: How often would you talk to Michael Peterson [Monon's insurance broker] about Anthem loaning money to Monon, just as needed?
> A: I don't know the number of times, but . . .

Trial tr., vol. 5 at 36. It is clear from Swanton's reference to the "number of times" that he understood the question exactly as the court and (the court presumes) the jury did: that the phrase "as needed" modified the "how often would you talk" portion of the

---

[4] As explained in the order of December 21, 2005, the court disagrees that the victim impact statement shows that APF believes that it suffered no loss. More importantly, the argument only has punch if the full-value purchase of the receivable was by the third party, Newcourt, as Franklin asserts was the case. Second Motion for New Trial at 8 ("purchaser of Anthem paid full value . . . for the Monon Corporation receivable on December 23, 1996.") Instead, as is clear from the document and as is explained in this opinion and order, Anthem remained stuck with the bad debt, while Newcourt got cash in the amount of the receivable.

question, not the "loaning money" portion. In other words, the question could be rephrased as: "Did you only speak to Peterson—*Monon's insurance broker*—whenever you needed to about lending money to Monon?" Thus, as the government maintains in its response to Franklin's motion, Swanton, on the heels of lengthy testimony concerning premium finance loans made to Monon, could only have thought his answer was limited to premium finance loans, and was not an admission that APF lent money "as needed" to Monon for any purpose whatsoever because of a motive to "gussy-up" APF for sale.

With this premise gone, Franklin's argument that the documents are material to the issue of his guilt or innocence also disappears. But even were that not the case, the court also disagrees with Franklin's assertions why the documents would have materially aided him in showing the jury that APF was lending money to advance its own interests, rather than as the result of fraud.

First, as the government asserts in its response to Franklin's motion, Franklin was aware prior to trial that APF was for sale and that efforts were being made to increase its attractiveness to buyers. Prior to trial Franklin was provided an FBI 302 dated September 22, 2000, memorializing an interview with Swanton, which stated (at p. 9) as follows:

> Swanton was asked to examine Government Exhibit 59. After examining the memo to all regional managers, he advised there was a lot of pressure to generate more loans at Anthem. He also stated that at that time, there were discussions about selling Anthem.

7

During cross-examination Swanton was asked questions concerning this memo, which expressed his concerns about APF failing to meet loan and profit projections. Thus, Franklin's claim of unfair surprise—that without the documents Swanton's "as needed" testimony did not reveal Swanton's motive of trying to "gussy up" APF for sale—rings hollow. In addition, the documents at best would only have been cumulative evidence on this issue with no material impact. The interests of justice do not warrant granting a new trial based on evidence that is merely cumulative. *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005).

Second, the court fails to see how the documents show that APF suffered no loss. In addition to the reasons explained in the December 21, 2005, memorandum order, incorporated herein, the SPA Amendment shows that this cannot possibly be correct. While the sale price that Newcourt initially agreed to pay to acquire APF may have been inflated by the Monon receivables, to close the transaction, APF's parent had to purchase those receivables for cash at book value, making the increased price a wash and leaving the uncollectible receivables within the Anthem corporate group.

Third, Franklin argues that the SPA Amendment shows the falsity of  Swanton's claims that he had no knowledge that the Monon loans were potentially uncollectible until Monon's bankruptcy proceeding in September 1996: "[s]omeone at Anthem of the third party purchaser knew something .  .  .. [T]he Monon receivable was carved out of the deal in July 1996." Second Motion for New Trial at 8. This is simply factually incorrect. While the stock purchase agreement itself was dated July 19, 1996, it did not

8

"carve out" the Monon receivables, the SPA Amendment did. The SPA Amendment was executed on December 31, 1996,[5] after the commencement of the Monon bankruptcy.[6]

Further driving this point home, the "Supplemental Affidavit" of Timothy Spears, the Executive Director of Litigation for Wellpoint, Inc. (Anthem, Inc.'s the corporate successor) is attached to the government's response. Spears explains that Anthem and Newcourt became aware after the stock purchase agreement was executed that the Monon receivables were potentially uncollectible, in part because of Monon's bankruptcy. Newcourt then demanded that Anthem purchase the receivables because that violated representations and warranties made in the stock purchase agreement. The SPA Amendment is simply not evidence that at the time the stock purchase agreement was executed, Swanton—or anyone else at Anthem or Newcourt—suspected that the Monon receivables might be bad debt.

Finally, even were Franklin correct on the timing involved, that timing—that is, that the loans were "carved out" in July 1996, showing that Swanton, Anthem and Newcourt already knew them to be uncollectible—proves, if anything, that Franklin's

---

[5] In support of his motion Franklin has provided only the first page of the document. The complete document, showing its date of execution on the signature page (p. 4), is attached to the affidavit of Timothy P. Spears, which itself is an exhibit to the "Supplemental Affidavit of Timothy P. Spears," which is an exhibit to the government's response.

[6]  Franklin acknowledges this by making the point that the receivables were purchased at full value despite Monon's bankruptcy, ignoring the fact that Anthem, not Newcourt, purchased them.

9

theory that Swanton was trying to inflate APF's receivables to increase its value for sale is incorrect. That theory makes sense only if the loans were successfully palmed-off on Newcourt, as Franklin incorrectly assumes by stating: "T]he purchaser of Anthem [Premium Finance] paid full value for the Monon Corporation receivable on December 23, 1996, after the bankruptcy of Monon Corporation in October 1996." Second Motion for New Trial at 8 (citations to exhibits omitted).

Instead, as is clearly shown by the documents Franklin relies on and confirmed by Spears' supplemental affidavit, APF's parent had to purchase the Monon receivable from APF for cash, so that Newcourt acquired the stock of a company with a cash asset instead of a bad receivable. On the other side of the transaction, any increase in APF's price brought about by the Monon receivable was offset by the seller, APF's parent Anthem, having to purchase the Monon receivables for cash prior to closing the sale. The long and the short of it is that Franklin's "carve out" theory is both factually and logically wrong.

Fourth, at pages 10-12 of his Second Motion for New Trial, Franklin argues that if the new documents supposedly showing that Anthem suffered no loss had been available at trial, Michael Peterson (Monon's insurance broker and a co-conspirator who pleaded guilty and appeared as a government witness) could have "been taken to task" regarding a May 31, 1996, premium finance loan by showing that the purpose of the loan was to bring Monon's accounts current with Anthem, not to finance workers' compensation premiums. Second Motion for New Trial at 10. Franklin believes this is

10

important because any false representations made to Swanton were made by Peterson, not by Franklin (or by his co-defendant at trial, Rosby), and that faxes (exs. 9-11 to Franklin's Second Motion for New Trial) between Peterson and Miles Holsworth (Monon's comptroller, and another co-conspirator who pleaded guilty and testified),, negotiating that loan show that there was never any reference to a workers' compensation policy, only to "premium."

Franklin is apparently arguing that this is additional evidence showing that, rather than being defrauded, APF understood that it was lending money for something other than insurance premiums. While the court must admit that it is not sure that this completely grasps what Franklin is driving at by making these two points involving Peterson, the argument nevertheless seems to go nowhere. There was ample evidence at trial from which the jury could conclude that Peterson and Franklin were members of the same conspiracy, and therefore any false representations made by Peterson to Swanton in furtherance of the conspiracy could be attributed to Franklin. As to the fact that the faxes refer to premium but not to workers' compensation insurance, the faxes were between Peterson and Holsworth, who was at Monon, not between Peterson and Swanton. Moreover, one of the faxes (ex. 9) does mention the need to have "Will, at Commonwealth Risk verif[y] the premium at $5.1 million, [or] we will not get any money." This is consistent with the government's theory that Anthem was being told that the loan was for the purpose of financing workers' compensation premiums.

Finally, in the last three pages of his motion, Franklin argues that there was a variance between the indictment and the government's proof at trial: that one of the transactions charged in the indictment involved the funding of a March 29, 1996, premium finance agreement, but the proof at trial instead showed that an April 1, 1996, premium finance agreement was the one funded. Franklin argues that a paragraph from the fourth page of the attachment to the newly-discovered Anthem victim impact statement is what proves this variance. The paragraph, quoted[7] on p. 13 of Franklin's Second Motion for a New Trial, states:

> On March 29, 1996, the third of the complained of transactions was completed. An application for $2,959,922.00 was submitted to Anthem to fund four (4) policies of insurance with ITT Hartford, Travelers Indemnity, Alliance Insurance and Legion (hereinafter "Application 3"). Pursuant to Application 3, Anthem distributed $2,440,357.54 to Peterson Associates on April 11, 1996.

Then, using testimony and exhibits from the trial, Franklin shows that this is incorrect: that the amount distributed—$2,440,357.54—can only be arrived at by using the amount of premium proposed to be financed in the April 1, 1996, premium finance agreement, not the March 29, 1996, agreement.

Therein—the showing that the victim impact statement is wrong–lies the problem with this argument. The victim impact statement identifies the March 29, 1996, finance agreement as being the one that caused Anthem's loss, consistent with the

---

[7] The court quotes from the victim impact statement. There are minor mistakes in Franklin's quotation not important to the analysis.

12

government's indictment. The victim impact statement merely repeats the (alleged) discrepancy; it does not indicate that a discrepancy exists. Franklin's evidence that the victim impact statement is incorrect, that the April 1, 1996, is instead involved, and that this is a variance from the indictment, comes completely from evidence that was available at trial. Thus, this argument is not based on newly-discovered evidence, and is one that had to be made within the seven-day period allowed by RULES 29(c)(1) and 33(b)(1) of the FEDERAL RULES OF CRIMINAL PROCEDURE. The court has no jurisdiction to consider the argument now. *Holt*, 170 F.3d at 702-03.

For the foregoing reasons, defendant Franklin's "Motion for New Trial and Supplement to Motion for New Trial and Motion for Acquittal" (DE # 192), and "Additional Motion for New Trial and Supplement to Motion for New Trial and Motion for Acquittal" (DE # 193) are both **DENIED**.


**SO ORDERED.**


ENTER: January 24, 2006


s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT